UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

FRANCIS MCALLISTER,                )
                                   )
            Plaintiff,             )
                                   )
     vs.                           )          Case No.  1:05CV59 AGF
                                   )
MICHAEL J. ASTRUE,                 )
Commissioner of Social Security,   )
                                   )
            Defendant.             )

## MEMORANDUM AND ORDER

This action is before the Court[1] for judicial review of the final decision of the

Commissioner of Social Security, denying Plaintiff Francis McAllister's application for

Supplemental Security Income ("SSI") under title XVI of the Social Security Act, 42

U.S.C. §§ 1381-84f.  For the reasons set forth below, the Court will reverse the decision

of the Commissioner and remand the case for further consideration.

## PROCEDURAL BACKGROUND

Plaintiff, who was born on November 6, 1961, applied for SSI on August 13, 1998,

at the age of 37, alleging that she was disabled since April 1, 1995, due to poor vision and

difficulty breathing.  (Tr. at 88-104.)[2]  Her claim was denied initially and upon

---

[1]     The parties have consented to the exercise of authority by the undersigned
United States Magistrate Judge under 28 U.S.C. § 636(c).

[2]     The ALJ stated that Plaintiff had filed an earlier application for SSI in June
1993, but that she did not seek agency review after the application was denied at the
initial administrative level.

reconsideration.  Following an evidentiary hearing held on October 22, 1999, an

Administrative Law Judge ("ALJ") held by decision dated February 3, 2000, that Plaintiff

could perform light work, with standing/walking limited to two hours without

interruption, and no work requiring fine or night vision.  Based upon the testimony of a

vocational expert ("VE") in answer to a hypothetical question posed by the ALJ, the ALJ

concluded that there were jobs Plaintiff could perform and that she was, thus, not

disabled.  (Tr. at 15-20.)

The Appeals Council denied Plaintiff's request for review, and Plaintiff sought

judicial review before the United States District Court for the Eastern District of

Arkansas.  While the case was pending, Plaintiff filed a new application for SSI benefits

on August 20, 2002, on the basis of a visual disorder, ulcers, breathing problems,

migraine headaches, and the inability to drive a car.[3]

On September 26, 2003, the Arkansas District Court remanded the case before it

for reconsideration by the ALJ, on the ground that in the question posed to the VE, the

ALJ did not include any standing or walking restrictions.  (Tr. at 706-09.)  On October

20, 2004, a new hearing was held before a different ALJ on both the 1998 application and

the 2002 application.  On January 13, 2005, the second ALJ found that Plaintiff had the

residual functional capacity ("RFC") to work at the light exertional level and was not

disabled because she could work as a production worker or fabricator, jobs identified by a

_____

[3]    A copy of this application is not in the record before the Court.  The above
information is taken from the ALJ's decision of January 13, 2005.  (Tr. at 688.)

vocational expert ("VE") at the October 2004 hearing. The Appeals Council declined to review the case. Plaintiff has thus exhausted all administrative remedies and the ALJ's decision of January 13, 2005, stands as the final agency action now on judicial review.

Plaintiff argues that the ALJ's decision is not supported by substantial evidence in the record. Specifically, Plaintiff argues that the ALJ did not consider fully whether Plaintiff's visual deficiencies met a presumed-disabling impairment listed in the Commissioner's regulations, at least as of January 2, 2002; erred in assessing Plaintiff's RFC; relied upon the VE's answer to a hypothetical question that did not encompass all of Plaintiff's impairments; relied upon the VE's identification of jobs at the medium exertional level, after having found that Plaintiff could only work at the light exertional level; failed to consider all of the evidence in evaluating Plaintiff's credibility; failed to develop the record fully with respect to Plaintiff's mental problems; and failed to consider Plaintiff's impairments in combination.

## MEDICAL RECORD[4]

Plaintiff's medical records indicate multiple health problems and hospitalizations since 1977 for, among other problems, a ruptured disk, a hysterectomy at age 25, migraine headaches, pelvic pain, neck pain, and deteriorating vision. Although under 20 C.F.R. § 416.501, SSI benefits are not available for any period before April 1998, when

---

[4]     By Order dated September 5, 2007, this case was remanded by the Court for the Commissioner to provide the complete record that was before the second ALJ. The case is now back before the Court upon the filing of the missing records by the Commissioner, and supplemental briefs by both parties. The Court also notes that in various parts of the medical record, Plaintiff is referred to as Francis Slatton.

Plaintiff's first application was filed, medical records predating this date can be instructive. In September 1977, Plaintiff, then 15 years old, was diagnosed with duodenitis/peptic disease. She was advised to follow a bland diet, and placed on antispasmodics and antacids. Id. at 130-33. On April 15, 1987, Plaintiff had a hysterectomy. Id. at 172-77.

On August 7, 1991, Plaintiff underwent cervical diskectomy and fusion at C5-6. (Tr. at 190-202.) Plaintiff saw neurosurgeon Gregory F. Ricca, M.D., several times for follow-up. Dr. Ricca's office notes of September 9, 1991, noted a well-healed fusion with excellent alignment, and that Plaintiff was "[o]verall doing well." (Tr. at 232.)

On October 25, 1991, Dr. Ricca noted that Plaintiff had returned ten days prior to her scheduled follow-up appointment because of recurrent neck and right upper extremity pain (symptoms similar to pre-surgery symptoms) of five days' duration. She also complained of headaches. The symptoms were so severe that Plaintiff had been given three intramuscular ("IM") injections over the past five days in an emergency room ("ER"). Dr. Ricca advised Plaintiff to continue wearing her neck collar, especially when in a car. Dr. Ricca also noted that Plaintiff seemed "slightly depressed," which he thought might be related to being restricted from some activities and to having to wear a cervical collar. (Tr. at 227-30.) When Plaintiff saw Dr. Ricca on November 21, 1991, she was advised that she could remove her neck collar, drive a car, and seek employment. (Tr. at 222-23.)

On April 30, 1992, Plaintiff saw Dr. Ricca with complaints of pain in the base of

her neck, associated with migraine headaches. She said that the headaches were precipitated by activity, even when she used her arms for simple housework. Dr. Ricca, observing that Plaintiff seemed to be "in moderate discomfort," noted cervical pain with associated headaches, and low back pain and lumbosacral myofascial strain. He did not know the etiology of Plaintiff's neck pain, but because she had good fusion from the surgery, he could not "imagine" it being related to the surgery, surmising that Plaintiff "may just have a simple cervical myofascia strain." Dr. Ricca prescribed Flexeril and Motrin. (Tr. at 218-21.)

On May 8, 1992, Jeffrey W. Roberts, D.C., prescribed use of a TENS[5] unit due to Plaintiff's symptoms, which were noted to be "acute severe sciatica and inability to perform everyday activities" with an onset date of April 30, 1992. The use of the TENS unit was found to relieve Plaintiff's pain, to eliminate the need for pain medication, and to improve Plaintiff's functional mobility, and Dr. Roberts believed that its continued use was warranted. (Tr. at 264.) On May 12, 2002, Dr. Ricca released Plaintiff from his care, noting that she still had neck pain and headaches when using her arms "a fair amount," and that she was receiving physical therapy for her neck. (Tr. at 217).

Plaintiff completed a neck-pain disability index questionnaire for Dr. Roberts on March 22, 1993, indicating that pain interfered with her daily activities by 82%. (Tr. at 252.) Plaintiff saw Dr. Ricca again on April 14, 1993, following a car accident

---

[5] TENS (Transcutaneous Electrical Nerve Stimulation) is a treatment for pain in which pads are placed near the area of pain and electrical pulses are sent via the pads through the skin along the nerve fibers. The pulses suppress pain signals to the brain.

approximately one month earlier, in which Plaintiff was a passenger in a vehicle that was rear-ended. Dr. Ricca noted that Plaintiff had decreased range of motion of her neck in all directions, and had not responded well to conservative measures thus far since the accident. The results of a new cervical and lumbar myelogram and CT scan ordered by Dr. Ricca and conducted on April 19, 1993, were essentially normal. (Tr. at 213-16.) Plaintiff was prescribed pain medication, advised to continue the medications she was already taking (Premarin and Pred-G ophtalmic drops[6]), and told to limit her activity and not to work until she was seen for follow-up in three or four weeks. Plaintiff continued to complain of a headache. (Tr. at 205-10.)

On June 9, 1993, Plaintiff indicated on another neck-pain disability index questionnaire that pain interfered with her daily activities by 52%. (Tr. at 247-48.) On June 21, 1993, Dr. Ricca wrote to another physician that Plaintiff was having pain in her neck, which was produced by activity and working with her upper extremities; that Plaintiff reported that she could not engage in her normal daily activities like washing dishes without producing neck pain; that Plaintiff had been in another car accident one week prior wherein she was rear-ended by another vehicle; and that she told Dr. Ricca that she had applied for disability benefits and asked if he could help her. Dr. Ricca wrote that Plaintiff was a "heavy set woman who [was] . . . in no apparent discomfort. She move[d] around the office normally, [and] [h]er neck did not have any muscle

---

[6]     This medication is used to treat conditions involving inflammation of the eyes and to treat or prevent bacterial eye infections.

6

spasms," although she complained of tenderness upon palpatation and examination of her neck. Dr. Ricca's examination that day was normal. He discussed with Plaintiff the possibility of a pain clinic, "where she could receive psychological testing as well as other forms of testing and possibly even soft tissue injections," but Plaintiff told Dr. Ricca that she did not want to do this at that time. Dr. Ricca prescribed Relafen and Flexeril. Dr. Ricca added that Plaintiff mentioned that she would be going to an amusement park, and Dr. Ricca advised her not to ride any roller-coasters. She stated that she wanted to ride them, and "also seemed to indicate that she would be doing this." Dr. Ricca advised her that he had nothing further to offer her, and that if she had further troubles, she should consult a pain clinic. (Tr. at 211-12.)

On a neck-pain questionnaire dated June 23, 1993, Plaintiff reported interference with daily activities of 58%. (Tr. at 240-41.) On July 14, 1993, Plaintiff was seen by Dr. Roberts, who diagnosed multiple cervical subluxation, thoracic subluxation complex, hyperextension or hyperflexion injury to the neck, and facet syndrome. He noted that to date, Plaintiff's treatment had been conservative, consisting of mild specific spinal adjustments, innerferential physiotherapy, and usage of a TENS unit. Plaintiff's prognosis was "guarded" because of the degenerative state of the soft tissue. Dr. Roberts believed that the duration of active treatment should be three to six months. Plaintiff had responded well to chiropractic care, but Dr. Roberts expected that she would need periodic supportive care with likely exacerbations. (Tr. at 239.)

On July 25, 1994, Plaintiff was admitted to the hospital with severe abdominal

pain. X-rays were consistent with gastroenteritis, and Plaintiff was discharged two days later with instructions to pursue out-patient follow-up. (Tr. at 279-80.)

On April 2, 1996, ophthalmologist R. Lowell Hardcastle, M.D., examined Plaintiff due to her complaints of "things running together, hazy vision, three changes of glasses during the past year, and difficulty telling which lane cars [were] in that [were] coming toward her." He reported to Gary Goza, M.D., (whom Plaintiff had been seeing for migraines for about nine years)[7] that the examination showed a right eye (od) unaided visual acuity of 20/70; a left eye (os) unaided visual acuity of 20/60; and 20/30 in each eye with glasses. Dr. Hardcastle stated that a neurological examination performed by another physician was normal, as were several tests Dr. Hardcastle had conduced. He wrote that he was unable to determine "an obvious pathological condition," but that Plaintiff's symptoms suggested a visual field abnormality. (Tr. at 316-18.)

Richard D. Drewry, M.D., a neuro-opthalmologist, examined Plaintiff on May 7, 1996. In a letter to Dr. Hardcastle dated May 11, 1996, Dr. Drewry wrote that Plaintiff described difficultly driving because she could not tell which lane an approaching car was in, with no difference in bright or dim light. Plaintiff reported that her migraines were accompanied by blurred vision. She had three pairs of glasses prescribed in the past year, but felt that none had significantly helped her vision. Dr. Drewry also wrote that Plaintiff "believes that she has a smaller than normal visual field. She states that she frequently 'runs over things' as she approaches them." (Tr. at 378.)

---

[7] The record does not include any medical notes from Dr. Goza.

Upon examination, Dr. Drewry recorded a visual acuity of 20/30 in each eye. Visual acuity was 10/25 in each eye when Plaintiff was moved to within ten feet of the vision chart. Kinetic visual field was noted as "depressed bilaterally with some spiraling of the right eye." Dr. Drewry concluded, "I did not see any specific eye abnormality on examination. There may be some non-organic component to her complaints." Dr. Drewry instructed Plaintiff to use multivitamins for six weeks and then to report back. (Tr. at 378-80.)

An Electo-oculogram ("EOG") and Electoretinogram ("ERG") were conducted on July 24, 1996. The EOG revealed a light/dark ratio in the normal range, and the ERG responses were normal as well. The testing physician commented that these findings did not "suggest the presence of a generalized retinal abnormality involving either eye." (Tr. at 371.)

Plaintiff was seen at the hospital several times from April 13, 1997, to July 9, 1998, for various ailments, including a urinary tract infection and bronchitis. On June 23, 1998, Plaintiff saw Dwight Williams, M.D., who wrote that Plaintiff had essential hypertension, migraines, menopausal syndrome, abdominal pain, malaise, fatigue, and uncomplicated type II diabetes. (Tr. at 327-29.) A July 9, 1998 EKG report stated that there was no evidence to suggest ischemia, and that Plaintiff possibly had asthma. (Tr. at 284-97.)

Plaintiff was seen by Mark Sifford, M.D., from July 15 to August 26, 1998, upon referral by Dr. Williams, for abnormal pulmonary function and shortness of breath. On

July 15, 1998, Dr. Sifford noted Plaintiff's complaint that she had had trouble with shortness of breath off and on for a few years, which had gotten worse over the last year, as she was experiencing shortness of breath while at rest.  He stated that the facts that Plaintiff had been on weight-loss medication in the past and that she was taking Inderal for her migraines might have contributed to her pulmonary problem.  Plaintiff's pulmonary function test indicated that she had significant obstructive defect.  She was taking Albuterol at the time, and Dr. Sifford added Singulair to her medications.  Dr. Sifford concluded, "at this point, it looks like she is going to have a reactive obstructive airway disease or a form of asthma but not everything fits perfectly with that."  (Tr. at 298-303.)

A July 24, 1998 echocardiogram showed mild mitral insufficiency, but was otherwise essentially normal.  (Tr. at 300).  On July 31, 1998, Plaintiff saw Dr. Sifford again, complaining of shortness of breath, and Dr. Sifford added Medrol to Plaintiff's medications.  On August 7, 1998, Plaintiff reported that the Mederol had helped her coughing, but that she was still having shortness of breath, and Dr. Sifford advised her to discontinue Inderal.  (Tr. at 300.)

On August 12, 1998, Plaintiff contacted Dr. Williams to talk about her migraine medication, and he prescribed Covera instead of Inderal.  Medical notes dated August 17, 1998, indicated that Plaintiff was still having headaches and difficulty breathing.  (Tr. at 320-23.)   At a follow-up visit with Dr. Sifford on August 26, 1998, it was noted that Plaintiff had stopped taking Inderal and that this helped with her breathing, but resulted in

more migraines. Plaintiff said that she had started taking her son's Albuterol, which helped her a little, but that her chest was tight all the time, no worse on exertion or when lying down. Dr. Sifford wrote that Plaintiff had dyspnea (shortness of breath) secondary to a reactive airways disease. (Tr. at 298-303.)

On September 28, 1998, Alessandro Iannaccone, M.D., to whom Plaintiff had been referred for full-field flash ERGs, wrote Dr. Drewry that the tests did not show any signs of retinal dysfunction, "arguing against the possibility that a diffuse retinopathy may account for [Plaintiff's] complaints." Dr. Iannaccone noted that, if anything, Plaintiff's ERGs were well above average in amplitude. Dr. Iannaccone summarized his findings as follows:

> I cannot reconcile [Plaintiff's] complaints and findings from psychophysical testing with these ERG results. . . . [A] maculopathy cannot be excluded at this time. This, however, should not cause visual field constriction. A pattern ERG or a pattern VEP [visual evoked potential] may be indicated to further delineate the situation, and rule out a problem with the optic nerves or pathways, or a retinal problem distal to the ERG generators, such as the ganglion cell layer. For however reluctant I may be to admit this possibility, normalcy of these additional tests would raise some serious concern about the organic nature of the disturbance.

(Tr. at 341-44.)

Consulting ophthalmologist Phillip Utley, M.D., examined Plaintiff on October 22, 1998. In a letter to the state disability agency dated October 23, 1998, Dr. Utley observed that Plaintiff was able to move about the office and examining room and get in and out of the chair without assistance. Examination showed intact and unremarkable motility, absence of ptosis (drooping eyelid), and normal pupillary response. Dr. Utley found that

11

Plaintiff's central visual acuity with best correction was 20/100 right and 20/70 left. He made a probable diagnosis of retinitis punctata albescens, noting that a variant of retinitis pigmentosa was a possibility,[8] and that Plaintiff was difficult to examine with the ophthalmoscope due to photosensitivity. The prognosis for the first possibility was good, while the prognosis for the second was not good. Dr. Utley stated that he would defer to the judgment of a neuro-ophthalmologist to "make the call on this one." (Tr. at 346-49.)

On October 26, 1998, an Exertional Capacity Assessment was completed by a non-examining medical consultant, who determined that the record established no exertional, postural, manipulative, communicative, or environmental limitations. Regarding visual limitations, the consultant indicated that Plaintiff's near acuity, far acuity, depth perception, and field of vision were "limited," and that Plaintiff "[s]hould not work where excellent vision is required." The consultant indicated that these symptoms were attributable, in his judgment, to a medically determinable impairment. (Tr. at 350-57.)

Dr. Drewry wrote a letter dated November 1, 1998, to the state disability determination agency recounting his history of treating Plaintiff. He stated: "Symptoms were suggestive of retinal degenerative process, although repeat ERG was normal. Because of the reduction of visual acuity and depression of the visual field she would have difficulty in ambulating, carrying, driving, and activities which require finite visual

---

[8]     Retinitis pigmentosa is a group of inherited disorders characterized by progressive peripheral vision loss and night vision difficulties that can lead to central vision loss. Retinitis punctata albescens, a genetic eye disease which causes flecks on the retinas, acts clinically like retinitis pigmentosa.

acuity." (Tr. at 358.)

On November 3 and 6, 1998, Plaintiff saw Dr. Williams for abdominal pain and nausea, which he treated with medications. (Tr. at 251-57.) In a letter to Dr. Williams, dated November 13, 1998, gastroenterologist Howard S. Brown, M.D., to whom Plaintiff had been referred for assessment, stated "we have found no specific diagnosis. There is the possibility that she has retained stones. She could have floating stones; she could have evidence of primary liver problems . . . ." (Tr. at 386-87.) A liver ultrasound performed on November 16, 1998, revealed no abnormality. (Tr. at 384.) An esophageal biopsy taken on November 17, 1998, was negative for dysplasia; a comment indicated that, "[d]epending on the level of biopsy, these findings are compatible with 'Barrett's esophagus.'" (Tr. at 383.)

By letter dated December 1, 1998, Dr. Brown wrote to Dr. Williams:

[Plaintiff] is doing very well, but she still has some epigastric pain on both Prevacid and Propulsid and is somewhat leery about whether she is going to improve. As you know, she is a very nervous individual and did have esophageal ulcers which need to be followed-up endoscopically. She is even hesitant to do that because of her fear of anesthesia, but she did agree to do so.

We are going to continue her on Prevacid and Propulsid for six additional weeks and then reevaluate her endoscopically and, hopefully, she will get over her persistent symptomatology by that time. Some of her symptoms are supertentorial in nature, rather than true epigastric symptoms, and she has a very "clinging" affect, as well, which is inappropriate, I think, for her age but I will address that at another time.

(Tr. at 381.)

On January 9, 1999, medical consultant William Payne, M.D., commented that

based upon his review of the medical records related to Plaintiff's visual problems, there was "no medically determinable impairment to explain Plaintiff's visual field loss," and that her condition was not severe.  (Tr. at 388.)  On June 23, 1999, Dr. Hardcastle opined on a form to a state employment program that Plaintiff could not work due to the degree of her progressive visual loss, and that there was no treatment for this loss.  (Tr. at 389.)

Medical records covering the period from October 5, 1998, to September 13, 1999, from Dr. Williams indicate that Plaintiff had a history of migraine headaches, a history of essential hypertension, and diabetes mellitus (type II), with a minor diagnosis of abdominal pain, esophageal ulceration, and anxiety.  (Tr. at 390-403; 411-58.)  The record also indicates that Plaintiff received hormone shots approximately monthly during the period of February 1998 to December 1999, for postmenopausal symptoms.  On June 19, 1999, Plaintiff was prescribed Diazepam for anxiety, which was noted as an existing problem in July 1999 (Tr. at 424-25, 421-23), December 1999 (Tr. at 581-83), February 2000 (Tr. at 581-83), December 2002 (Tr. at 759), May 2003 (Tr. at 742), and June 2004 (Tr. at 730).

Meanwhile, in a letter dated August 30, 1999, Dr. Drewry wrote to Dr. Hardcastle that although Plaintiff's "symptoms are suggestive of retinal disease, clinical examination has been relatively normal, and ERG has failed to establish a definitive diagnosis."  (Tr. at 404.)  In a letter to Plaintiff's attorney dated November 1, 1999, Dr. Drewry wrote that Plaintiff had a reduction of visual acuity in each eye, although clinical examination and laboratory procedures failed to reveal a definitive diagnosis.  He stated that Plaintiff's

visual acuity was 20/70 in her right eye; and 20/80 in her left eye at distance, with visual acuity at 20/200 at near. "Because of the reduction of visual acuity and depression of visual field," Dr. Drewry continued, Plaintiff "would have difficulty in ambulating, driving, reading and other daily activities." (Tr. at 459.)

In another letter to Plaintiff's attorney dated December 6, 1999, Dr. Drewry recounted that Plaintiff's best-corrected distant visual acuity on her last examination (August 30, 1999) was 20/70 in her right eye and 20/80 in her left, adding that her visual acuity had not been less than 20/200 at any of her examinations. "Previous letters had indicated a visual acuity at near of 20/200, although distance visual acuity is the best indication of day to day functioning." (Tr. at 460.)

Meanwhile, clinic notes dated November 10, 1999, prepared by a nurse, stated that Plaintiff's mood and affect showed no depression, anxiety, or agitation. (Tr. at 498.) But on January 29, 2001, Dr. Williams advised that Plaintiff "should get out and get more active and get an occupation to keep her busy, this will improve her[] anxiety and depressive symptoms." He further stated that she was "not disabled, just trying to cope with children and a fairly recent divorce." He refilled her medication for headaches, as well as her Diazepam. (Tr. 993). Clinic notes from November 27 and December 12, 2001, indicated that Plaintiff received hormone injections on those dates. (Tr. at 666, 673.) Clinic notes from Dec. 7, 2001, indicated that Plaintiff called complaining of depression and requesting to be put back on Prozac. (Tr. at 679.) And clinic notes dated December 2, 2002, reported that Plaintiff had no depression, anxiety, or agitation upon a

mental status examination; that her migraine condition was unchanged; and that her hypertension had improved.  (Tr. at 757-61.)

On January 2, 2002, Dr. Drewry examined Plaintiff and opined that she had a bilateral reduction of visual acuity to the legal blindness level.  However, he was "unable to establish a definitive diagnosis in her case."  (Tr. at 890-94).  On January 5, 2002, Plaintiff went to the ER with a migraine headache for which she was given an injection. (Tr. at 895-97.)  By report dated September 5, 2002, Dr. Williams diagnosed backache not otherwise specified, hypertension, uncomplicated diabetes, endocrine disorder, anxiety, fibroadenosis, and palpitations.  (Tr. at 911).

In a letter dated October 29, 2002, to the state disabilities determination agency, Dr. Utley described the results of his examination of Plaintiff the previous day.  He stated that in general, Plaintiff moved hesitantly about the office and examining room and could get in and out of a chair without assistance once she was guided to the chair.  He observed that Plaintiff touched hallway walls as she moved through the corridor.  Dr. Utley stated that he was unable to make a definitive diagnosis, but that additional testing might reveal an organic cause for Plaintiff's "apparent visual deficit."  (Tr. 995-97).

The record includes a report by an employee of the state disability determinations agency documenting a phone conversation with Dr. Williams on November 18, 2002.  Dr. Williams reportedly related that he had not observed any signs that would be consistent with significant visual loss, and indicated further that Plaintiff's threshold for seeking medical attention was quite low and her complaints were at times "hysteric" in nature.

The report is not signed.  (Tr. 998).

A "To Whom Concerned" letter dated June 11, 2002, from Dr. Hardcastle stated that it was impossible for Plaintiff to perform working tasks such as reading or working with small objects, and that driving was impossible for her.  (Tr. 1003).  On November 19, 2002, Dr. Hardcastle wrote to Plaintiff's attorney that a dilation exam conducted on the previous day showed that Plaintiff had "profound vision loss to legal blindness in each eye and that her vision had declined to less than 20/400 in each eye.  Dr. Hardcastle explained that this was compatible with retinitis pigmentosa, but that the definitive diagnosis continued to be illusive.  (Tr. at 1000).

The record includes treatment notes from October 2002 to August 2004, during which time Plaintiff was seen by Mack Shotts, M.D., for refills and adjustment of her migraine medication and Diazepam.  (Tr. 718-66.)  Notes dated October 20, 2003, state that Plaintiff had reported having migraines for years and that they were getting steadily worse.  (Tr. at 738-56.)

In a consulting neuro-ophthalmology report dated March 3, 2003, Andrew W. Lawton, M.D., observed that Plaintiff maneuvered easily around the waiting area and examination room without assistance, and that she readily found and took objects in her far peripheral field.  He found no organic explanation for Plaintiff's visual complaints. The testing he conducted was "all incompatible with her stated vision and visual field results.  In fact, her performance on two-pen testing is consistent with a visual acuity of at least 20/40 in each eye and a full field of vision in each eye."  Dr. Lawton suggested that

ERG testing might clarify Plaintiff's visual function.  (Tr. at 1005).

On March 6, 2003, consultant George DeRoeck, Psy.D., conducted a psychological evaluation of Plaintiff.  He observed that Plaintiff presented with a slow rate of ambulation, that her affect was flat and mood dysphoric, and that she was tearful in relating background information, which included being raped at the age of 16, and an early three-year marriage to an abusive husband.  Plaintiff stated that she was "nervous a long time," with limited stress tolerance and difficulty with concentration.  She reported depressive symptoms, such as crying, sleep problems, loss of appetite, and suicidal ideation with apparent attempts the previous summer.  (Tr. at 1008-10.)

Plaintiff also told Dr. DeRoeck about her vision problem, claiming that it had worsened over the past 18 months and that she had become increasingly dependent on others for assistance in her activities of daily living.  She also identified migraine headaches, which she experienced two to three times a month, as a problem.  Plaintiff reported that she had a grown daughter and a 17-year old son with whom she was currently living and who had cerebral palsy, asthma, and attention deficit hyperactivity disorder.  Dr. DeRoeck wrote that Plaintiff last worked in 1986, stopping following the birth of her son to care for him due to his medical problems.  He also wrote that Plaintiff "did not 'appear' to have difficulty with vision at the session though evidence of strabismus [cross-eyes, squinting] was evident at various points."  (Tr. at 2008-10.)

Plaintiff's thoughts were logical and coherent and she was able to remain on task. Testing revealed "a poor response pattern in abstract reasoning and general fund of

information."  Plaintiff related that he could only watch TV for about five minutes at a time and having to close her eyes because they hurt watching TV.  She also related that she did not read for enjoyment, stating, "I can't make it out."  Dr. DeRoeck observed that Plaintiff "had a slow personal tempo though, otherwise, 'appeared' to be able to see both upon entering and leaving" the session.  (Tr. at 1010-13).

Dr. DeRoeck diagnosed "Depressive disorder, NOS [not otherwise specified], versus major depression -- single episode and anxiety traits"; possible borderline intellectual development and dependent personality disorder; and legal blindness, asthma, borderline diabetes, and hypertension.  He identified Plaintiff's psychological stressors as coping with legal blindness and decreased activities of daily living.  Dr. DeRoeck diagnosed a current Global Assessment of Functioning ("GAF") score of 50, with a high of 58 during the past year,[9] and opined that treatment for depression was indicated, and possibly an intellectual assessment as well.  (Tr. at 1013-15).

On March 13, 2003, a state non-examining consultant, Brad Williams, Ph.D., completed a Mental RFC Assessment indicating in check-box format that Plaintiff was moderately limited in her ability to carry out detailed instructions, to maintain attention

---

[9]    A GAF score represents a clinician's judgment of an individual's overall ability to function in social, school, or occupational settings, not including impairments due to physical or environmental limitations.  Diagnostic & Statistical Manual of Mental Disorders (4th ed.) (DSM-IV) at 32.  GAF scores of 31-40 indicate "[s]ome impairment in reality testing or communication or "major" impairment in social, occupational, or school functioning; scores of 41-50 reflect "serious" impairment in these functional areas; scores of 51-60 indicate "moderate" impairment; scores of 61-70 indicate "mild" impairment.

and concentration for extended periods, to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, accept instructions and respond appropriately to criticism from supervisors, and to set realistic goals and make plans independent of others. In narrative form, Dr. Williams wrote that Plaintiff was able to perform work such as assembly work, where interpersonal contact was incidental, tasks could be learned and performed by rote, and little judgment was required. In his notes he wrote, "Physical = <u>non</u>-<u>severe</u> (<u>thought to be malingering</u>)." (Tr. at 1017-33.)

By letter dated February 4, 2004, to Plaintiff's attorney, Dr. Hardcastle wrote as follows:

> Find enclosed a copy of my last examination. Due to continued inability to establish a definitive diagnosis to support her claim of poor vision, inability to read, and, therefore, inability to work, I requested a repeat ERG [on January 2, 2004] to attempt to provide objective evidence electrophysiologically. As you can see in the report, the readings are essentially normal.
>
> I have communicated with Dr. Lucie Elfervig, D.N.S. regarding this study. She expressed, and I have observed, that [Plaintiff] gets around and functions without help much better than one would expect for a person so visually handicapped, especially the peripheral field deficiency. With a visual field contracted to fixation, not to mention the acuity reduced to 20/300 to 20/400, one would expect a person to be unable to get around a room without bumping into things and/or stumbling over objects. One [would] expect her to be functionally blind and require someone to guide her by the hand.

(Tr. at 771.)

On June 30, 2004, Plaintiff was seen at the clinic for "chronic management of headaches, which [had] been unstable." Plaintiff's medications were refilled. (Tr. at 727-30.) The record includes charts from Plaintiff's visits to the clinic on September 17 and 22, 2004. At these visits, Plaintiff received a minor diagnosis of viral gastroenteritis. Her then-current medication list included Diazepam, Propranolol, Hydrocodone, and Darvocet-N. (Tr. at 775-79.)

Dr. Hardcastle wrote a letter, "To Whom Concerned," dated October 4, 2004, similar to his letter of February 4, 2004, noting again that there were "no objective findings to support the unexplained loss of vision," and that Plaintiff "got around amazingly well, considering her apparent disability." (Tr. at 774.)

## EVIDENTIARY HEARING OF OCTOBER 20, 2004

Plaintiff, represented by counsel, appeared by video before the ALJ at this hearing. Plaintiff testified that she lived with her 22-year old daughter, was 42 years old, and was a high school graduate. She testified that she was unable to read newspaper print. She had a driver's license, issued on November 2, 2000, indicating a corrective lens restriction. Plaintiff maintained that she was able to avoid taking a vision test when she received her license by telling "them the machine didn't work." She needed the license to allow her 14-year old son to drive using his permit, which required a licensed driver to be in the car. But she stated that she had stopped driving long before November 2000, because she was unable to tell which lane cars were in. Plaintiff stated that she had not worked since 1986, and that her vision, headaches, and "nerves" were the primary factors contributing

to her inability to work.  (Tr. at 784-87.)

Plaintiff stated that her vision had gotten worse over the years.  Also, her headaches interfered with her daily activities.  About once a week they were of such severity that she would have to lie down; with pain medication, the headaches would improve in two or three days.  Plaintiff testified that she was very nervous around people, that this problem had been getting worse, and that medication helped a "little bit."  She also stated that her "nerves" had not been as bad in the 1980s, when she last worked.  (Tr. at 788-89.)  Plaintiff testified that she could not see a television screen from a normal distance.  She noted that her vision was worse than it was in 1999, when she was able to see the screen when very close to it, although it was blurry.  She further stated that her vision interfered with her daily activities, causing her to run into things when she was not familiar with a place.  Plaintiff stated that she was unable to read large street signs and "things of that nature," and was unable to identify people if they were very far off, but could recognize their shapes if they were in the same room.  She could not see people when they approached from the side.  She stated that she had pinhole vision and could only see what was right in front of her; that she had worn glasses, bifocals, contacts, and bifocal contacts without improvement; and that her doctor instructed her to wear glasses to protect her eyes in case she ran into things.  (Tr. at 789-91.)

Eddy Ward, Plaintiff's friend of six years, testified that Plaintiff could not work because she could not see what she was doing, that she had not driven in the six years of their friendship, and that she depended on Ward and his daughter to do things for her

because of her very limited vision.  (Tr. at 791-92.)

The ALJ asked a VE to identify jobs available for a hypothetical individual the same age as the Plaintiff with the same educational background and lack of work experience, who was exertionally able to do light work that was unskilled in nature, involved only superficial interpersonal contact, did not require "excellent vision," did not involve operating automotive equipment, and did not require working around heights or in hazardous areas.  The VE sought clarification of what the ALJ had meant by "excellent vision," and the ALJ elaborated that the hypothetical individual would be able to see at short range but "not well enough to operate an automobile on a job or to see at a distance, [and] wouldn't be able to use fine vision where you had to look at precise very small tiny details in a job."  The VE responded that such an individual could work as a light "production worker," including jobs in assembly on a "larger type product," and other "production categories," such as packaging.  The VE testified that there were approximately 6,500 light production jobs in Arkansas, a number which included work requiring precise vision, such as assembly of semiconductor processors.  In addition, there were about 350 jobs in Arkansas in the "miscellaneous assembler and fabricators category" at the light exertional level.  (Tr. at 793-94.)

The ALJ then presented a second hypothetical question, involving an individual with the same vocational factors (age, education, and past work experience) as the first, plus a combination of exertional and non-exertional problems precluding sustained work activity for a full eight-hour day on a regular and consistent basis.  The VE responded that

23

he could not identify any jobs such an individual could perform.  The VE stated that his conclusions were consistent with the provisions of the Dictionary of Occupational Titles ("DOT").  (Tr. at 794-95.)

Plaintiff's counsel argued that even if the evidence did not support Plaintiff's claim of disability since the initial filing, evidence showed that at least from January 2, 2002, she suffered from vision loss sufficient to meet the requirements of deemed-disabling impairments listed in the Commissioner's regulations, specifically listings 2.02 (remaining vision in the better eye after best correction of 20/200 or less), 2.03 (contraction of peripheral visual fields in the better eye), and 2.04 (loss of visual efficiency).

## ALJ'S DECISION OF JANUARY 13, 2005

The ALJ found that the objective medical evidence supported the conclusion that Plaintiff had the following impairments:

> a remote history of status post anterior cervical diskectomy and fusion at C5-C6 for a right radiculopathy . . . without ongoing symptomatology or residual; a history of decreased peripheral visual fields and decreased visual acuity in each eye; a history of migraine headaches; a history of essential hypertension and diabetes mellitus (type II) with a minor diagnosis of abdominal pain, and a history of depressive disorder versus major depression (single episode with anxiety traits) with rule out borderline intellectual functioning and development, and dependent personality disorder.

(Tr. at 689) (record references omitted).

The ALJ stated that the record showed "rather extensive treatment history; however without indication of a need for inpatient treatment or any more extentive [sic]

treatment measures than very conservative follow-up and medication management." Id. The ALJ found that Plaintiff's combination of impairments was severe within the meaning of the Commissioner's regulations, but that none met the criteria of any of the presumed-disabling impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, as no treating or examining physician or state agency medical consultant mentioned findings equivalent in severity to the criteria of any listed impairment.  (Tr. at 689-90.)

The ALJ proceeded to assess Plaintiff's RFC, noting that Plaintiff's subjective allegations and credibility were to be evaluated under the standard set forth in Polaski v. Heckler, 751 F.2d 943 (8th Cir. 1984).  The ALJ stated that there was no evidence in the record to show that Plaintiff had "ever required any more than just the administration of oral medications" to address her alleged weekly headaches and "nerves."  The ALJ also stated that there was no evidence to show that Plaintiff had "ever been medically advised to pursue counseling intervention or that she had ever been referred for psychological treatment during any period currently under adjudication."  Thus, the ALJ concluded, there was no support for the contention that Plaintiff had disabling, emotionally-based symptoms.  The ALJ further determined that Plaintiff's hypertension was under adequate control, and that her migraine headaches were not so pervasive or resistive to treatment to be considered disabling.  (Tr. at 691.)

The ALJ then turned to Plaintiff's "primary contention" of a disabling visual impairment.  The ALJ stated that Plaintiff's treating physician (Dr. Hardcastle) had at one point (on June 23, 1999) indicated that Plaintiff's visual problems were disabling.  The

ALJ added, "however, the physician later indicated that there was no basis for [Plaintiff's] alleged level of impairment and/or limitation." In support of this statement, the ALJ referred to Dr. Iannoccone's letter of September 28, 1998, to Dr. Drewry (Tr. at 341-44); Dr. Drewry's letter of November 1, 1998, to the state disability determination agency (Tr. at 358); Dr. Hardcastle's letter of February 4, 2004, to Plaintiff's counsel (Tr. at 771); and Dr. Hardcastle's "To Whom Concerned" letter of October 4, 2004 (Tr. at 774). Id.

The ALJ stated that Mr. Ward's testimony was not entitled to controlling weight, in that it "for the most part, merely corroborated the testimony of [Plaintiff] regarding the severity and nature of her symptoms, and appeared to be based on an uncritical acceptance of [her] complaints and a potential desire to see her receive benefits," and was "not fully supported by the weight of substantial evidence." (Tr. at 692.)

The ALJ further found no evidence that Plaintiff was ever "definitively advised by any treating or examining physician that his [sic] symptoms are of such severity as to completely preclude involvement in substantial gainful activity." Id. The ALJ found "numerous contradictions," which the ALJ did not identify, between Plaintiff's "allegations and other substantial evidence . . . regarding the nature and severity of her impairments," and that thus, Plaintiff's allegations and testimony were "unsupported by the record as a whole and therefore, less than fully credible." Id.

The ALJ found that Plaintiff had the RFC to lift-carry and push-pull 20 pounds occasionally and 10 pounds frequently, with the ability to stand and/or walk at least six to

eight hours in an eight-hour workday (at least two hours in a continuous period), and to sit six to eight hours in an eight-hour workday (at least two hours in a continuous period). (Tr. at 693.)  The ALJ further found Plaintiff would require work of an unskilled nature that involved only superficial contact with others, and that Plaintiff would be precluded from work "requiring excellent visual acuity" or the operation of automotive equipment or work performed at unprotected heights or in hazardous areas.  The ALJ noted that, as Plaintiff had no past relevant work, the burden shifted to the Commissioner to show that there were jobs Plaintiff could perform.  Based on Plaintiff's RFC, the ALJ found that Plaintiff was able to perform a significant range of light work, as defined in 20 C.F.R. § 416.967,[10] with her ability to perform the full range of light work being impeded by "additional exertional and/or non-exertional limitations."  (Tr. at 693-94.)  Based upon the VE's testimony, the ALJ concluded that Plaintiff could work as a production worker or fabricator, and was thus not disabled.  (Tr. at 694.)

---

[10]    "Light work" is defined as work that involves lifting no more than 20 pounds at a time with frequent lifting or carrying of up to ten pounds; and that might require a good deal of walking or standing, sitting most of the time, and some pushing and pulling of arm or leg controls.  Social Security Ruling (SSR) 83-10 elaborates that the full range of light work requires standing or walking, off and on, for a total of approximately six hours of an eight-hour work day, while sitting may occur intermittently during the remaining time; that the lifting requirement for the majority of light jobs can be accomplished with occasional, rather than frequent, stooping; and that many unskilled light jobs are performed primarily in one location, with the ability to stand being more critical than the ability to walk. 1983 WL 31251, at *6 (1983).

**DISCUSSION**

**Standard of Review and Statutory Framework**

      In reviewing the denial of Social Security disability benefits, a court must affirm the Commissioner's decision "so long as it conforms to the law and is supported by substantial evidence on the record as a whole." Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005). This "entails a more scrutinizing analysis" than the substantial evidence standard. Id. The court's review is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision; the court must "also take into account whatever in the record fairly detracts from that decision." Id. Reversal is not warranted, however, "'merely because substantial evidence would have supported an opposite decision.'" Id. (quoting Shannon v. Chater, 54 F.3d 484, 486 (8th Cir.1995)).

      To be entitled to benefits, a claimant must demonstrate an inability to engage in any substantial gainful activity which exists in the national economy, by reason of a medically determinable impairment which has lasted or can be expected to last for not less than 12 months. 42 U.S.C. § 423(d)(1)-(2). The Commissioner has promulgated regulations, found at 20 C.F.R. § 416.920, establishing a five-step sequential evaluation process to determine disability. The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If so, benefits are denied. If not, the Commissioner decides whether the claimant has a "severe" impairment or combination of

impairments. A severe impairment is one which significantly limits a person's physical or mental ability to do basic work activities such as walking, standing, sitting, and understanding instructions. 20 C.F.R. § 416.921.

If the claimant's impairment or combination of impairments is not severe, the claim is denied. If the impairment or combination of impairments is severe, the Commissioner determines at step three whether the claimant's impairment meets or is equal to one of the impairments listed in the Commissioner's regulations at 20 C.F.R. Part 404, Subpart P, Appendix 1. If the claimant's impairment is equivalent to one of the listed impairments, the claimant is conclusively presumed to be disabled. If the impairment is one that does not meet or equal a listed impairment, the Commissioner asks at step four whether the claimant has the RFC to perform past relevant work. If the claimant is able to perform past relevant work, she is not disabled. If she cannot, the burden of proof shifts at step five to the Commissioner to demonstrate that the claimant retains the RFC to perform a significant number of other jobs in the national economy that are consistent with the claimant's impairments and vocational factors (age, education, and work experience).

If a claimant can perform the full range of activities in a particular category of work (very heavy, heavy, medium, light, and sedentary) listed in the Commissioner's regulations, the Commissioner may carry this burden by referring to the Medical-Vocational Guidelines, 20 C.F.R. Pt. 404, Subpart P, Appendix 2 ("Guidelines"). The Guidelines are fact-based generalizations about the availability of jobs for people of

varying ages, educational backgrounds, and previous work experience, with differing

degrees of exertional impairment. Where a claimant has non-exertional impairments,

such as pain and depression, which significantly diminish her ability to perform the full

range of activities in a particular category, the ALJ cannot carry the step-five burden by

relying on the Guidelines, but must consider testimony by a VE as to jobs a person with

Plaintiff's vocational factors and RFC could perform. Draper v. Barnhart, 425 F.3d 1127,

1132 (8th Cir. 2005).

## Listed Visual Impairment

Plaintiff argues that the ALJ did not consider fully whether Plaintiff's visual

deficiencies met a presumed-disabling impairment listed in the Commissioner's

regulations, specifically listings 2.02 (impairment of visual acuity), 2.03 (contraction of

peripheral visual fields in the better eye), and 2.04 (loss of visual efficiency).[11] Plaintiff

argues that the objective medical evidence establishes a visual disorder of listing-severity,

and that the lack of a specific diagnosis does not support the ALJ's decision at step three

of the evaluation process.

Listing 2.00A.5 in effect at the time of the ALJ's decision provided that "[l]oss of

visual efficiency may be caused by disease or injury resulting in reduction of visual acuity

---

[11]    Effective February 20, 2007, the listings for visual disorders were revised.
See Fed. Reg. 67039 Nov. 20, 2006). In revising the listings, the Social Security
Administration stated that it expected that a court's review of a final decision of the
Commissioner would apply the regulations in effect at the time the Commissioner's final
decision was issued. Id. In any event, the Court finds that the revisions involved here do
not altar the Court's analysis of the case.

or visual field." Listing 2.00A.7 provided, "both 2.02 and 2.03 A and B denote statutory blindness." These listings provided as follows:

> 2.02 *Impairment of Visual Acuity.* Remaining vision in the better eye after best correction is 20/200 or less.
> 2.03 *Contraction of peripheral visual fields in the better eye,* with:
>   A. To 10°or less to the point of fixation no greater than 20 degrees; or
>   B. So the widest diameter subtends an angle no greater than 20°.; or
>         C. To 20 percent or less visual field efficiency.
>         2.04 *Loss of visual efficiency.* The visual efficiency of the better eye after best correction is 20 percent or less.

20 C.F.R. Pt. 404, Subpt. P, App. 1, 2.00-2.04 (2005).

The Commissioner argues that Plaintiff's alleged visual limitations are "symptoms" rather than a medically determinable eye disease or injury, and that the latter is necessary to establish a disability. The Commissioner's argument is based upon the absence in the medical record of a definitive diagnosis as to Plaintiff's visual problems. The Commissioner argues that "[a]lthough admittedly the ALJ could have been more specific in citing to the evidence in the record, the conclusion the ALJ reached regarding the evidence was clear -- the ALJ did not believe Plaintiff's allegation of blindness." (Doc. #32 at 4.) The Commissioner argues that substantial evidence supports this finding. The Commissioner maintains that the record indicates that Dr. Hardcastle was skeptical as to the validity of Plaintiff's reported visual problems. The Commissioner points to Dr. Hardcastle's comments on October 4, 2004, that Plaintiff got around and functioned much better than one would expect, considering her "apparent disability." (Tr. at 771, 774.)

The Commissioner also relies on Dr. Lawton's March 3, 2003 opinion that Plaintiff's performance on "two-pen testing" was consistent with a visual acuity of at least 20/40 in each eye and a full field of vision in each eye; Dr. Dwight Williams' January 29, 2001 opinion that Plaintiff was not disabled; and Dr. Brad Williams' March 13, 2003 note that some unidentified medical source thought that Plaintiff was malingering with respect to her physical impairments. The Commissioner notes that the ALJ's RFC assessment did include some visual limitations, and argues that the record supports the decision not to include any more restrictive visual limitations.

The visual limitations included in the ALJ's RFC assessment were the inability to engage in work that required "excellent visual acuity," operating automotive equipment, or working at unprotected heights or in hazardous areas.

Here, two ophthalmologists noted objective test results that met the criteria in the listings. In his letter of February 4, 2004, to Plaintiff's attorney, Dr. Hardcastle wrote that tests indicated that Plaintiff had a visual field contracted to fixation, and visual acuity of 20/300 to 20/400. And on January 2, 2002, Dr. Drewry examined Plaintiff and opined that she had bilateral reduction of visual acuity to the statutory blindness level. However, the record contains numerous comments by Dr. Hardcastle and other physicians questioning the validity of the test results in light of their own observations of Plaintiff's functioning. As late as March 3, 2003, Dr. Lawton observed that Plaintiff maneuvered easily around the waiting area and examination room without assistance, and that she readily found and took objects in her far peripheral field. In addition there is the

conflicting March 3, 2003 opinion of Dr. Lawton stating that Plaintiff's performance on "two-pen testing" was consistent with a visual acuity of at least 20/40 in each eye and a full field of vision in each eye. And Dr. Hardcastle's letters of February 4, 2004 and October 4, 2004 suggest skepticism regarding the severity of Plaintiff's condition.

In light of the above, the Court concludes that the ALJ was entitled to find, at step three of the evaluation process, that Plaintiff did not meet the listing criteria for statutory blindness. It is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians. Hacker v. Barnhart, 459 F.3d 934, 936 (8th Cir. 2006); Pearsall v. Massanari, 274 F.3d 1211, 1219 (8th Cir. 2001). Here there is much in the record to suggest that Plaintiff's symptoms were exaggerated.

**ALJ's Assessment of Plaintiff's RFC**

In related arguments Plaintiff contends that the ALJ erred in assessing her RFC by failing to include the full extent of her visual problems (even if they were not of listing-severity), which would preclude the job of fabricator of semiconductor processors mentioned by the ALJ. She notes further that assembler of semiconductor processors is a job at the medium exertional level, according to the DOT. Plaintiff also complains that the ALJ did not factor into the RFC assessment Plaintiff's migraine headaches and mental problems, did not accord proper weight to the testimony of Plaintiff and Mr. Ward, did not consider Plaintiff's impairments in combination, and erred in relying upon the hearsay, unsigned report of a November 18, 2002 phone conversation with Dr. Dwight Williams. Plaintiff argues that as a result, the hypothetical question posed to the VE did

not capture all of Plaintiff's impairments, and that thus, the VE's testimony cannot constitute substantial evidence to support the decision that Plaintiff was not disabled.

The Court rejects Plaintiff's arguments regarding the job of assembler of semiconductor processors because this job was not one identified by the VE or the ALJ as one that Plaintiff could perform. A careful review of the VE's testimony and ALJ's decision shows that it was only light assembly and packaging jobs involving larger products which were considered appropriate for an individual with Plaintiff's RFC and vocational factors.[12] Nevertheless, the Court agrees with Plaintiff that the ALJ's RFC assessment is flawed to the extent that the case must be remanded again.

A disability claimant's RFC is the most he or she can still do despite his or her limitations. 20 C.F.R. § 404.1545(a)(1). In McCoy v. Schweiker, 683 F.2d 1138 (8th Cir. 1982) (en banc), the Eighth Circuit defined RFC as the ability to do the requisite work-related acts "day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." Id. at 1147. The ALJ's determination of an individual's RFC should be "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Krogmeier v. Barnhart, 294 F.3d 1019,

---

[12] Social Security Ruling 85-15 states that visual impairments are nonexertional and "as long as [a claimant] retains sufficient visual acuity to be able to handle and work with rather large objects (and has the visual fields to avoid ordinary hazards in the workplace), there would be a substantial number of jobs remaining across all exertional levels."

1024 (8th Cir. 2002) (quoting <u>McKinney v. Apfel</u>, 228 F.3d 860, 863 (8th Cir. 2000)).

Although a claimant's RFC is determined at step four of the sequential evaluation process, where the burden of proof rests on the claimant, the ALJ bears the primary responsibility for determining a claimant's RFC. <u>Id.</u> As noted, an RFC is based on all relevant evidence, but it "remains a medical question" and "'some medical evidence must support the determination of the claimant's [RFC].'" <u>Id.</u> at 1023 (quoting <u>Hutsell v. Massanari</u>, 259 F.3d 7, 711 (8th Cir. 2001); <u>Lauer v. Apfel</u>, 245 F.3d 700, 704 (8th Cir. 2001).

In order to constitute substantial evidence upon which to base a denial of benefits, the testimony of a VE must be in response to a hypothetical question which "captures the concrete consequences of the claimant's deficiencies." <u>Robson v. Astrue</u>, 526 F.3d 389, 392 (8th Cir. 2008) (citation omitted); <u>see also</u> <u>Swope v. Barnhart</u>, 436 F.3d 1023, 1025 (8th Cir. 2006) (stating that it is critical at step five "for ALJs to pose thorough and complete hypothetical questions to vocational experts"; case reversed and remanded where that was not done). The question need not include alleged limitations which the ALJ properly discredits. <u>Randolph v. Barnhart</u>, 386 F.3d 835, 841 (8th Cir. 2004).

Here, the ALJ found that Plaintiff's severe impairments included a history of depressive disorder, and the possibility of borderline intellectual functioning and development and dependent personality disorder. These limitations were apparently based upon Dr. DeRoeck's March 6, 2003 psychological evaluation of Plaintiff. In his RFC assessment, however, the ALJ did not include any limitations due to these

impairments, such as the moderate limitation noted by Dr. DeRoeck in Plaintiff's ability to carry out detailed instructions, and to maintain attention and concentration for extended periods. Rather, the ALJ stated that there was no evidence to show that Plaintiff had ever been medically advised to pursue counseling intervention or that she had ever been referred for psychological treatment during any period currently under adjudication, and concluded that there was no support for the contention that Plaintiff had disabling, emotionally-based symptoms during the relevant time period. The ALJ did not explain how he weighed Dr. DeRoeck's evaluation. Even if Plaintiff's "emotionally-based" impairments were not disabling, they had to be factored into the ALJ's RFC assessment. See 20 C.F.R. § 404.1523; Social Security Ruling 96-8p, 1996 WL 374184, at *5 (stating that when assessing an individual's RFC, the ALJ "must consider an individual's impairments, even those that are not 'severe'"; when considered in combination, "the limitations due to such a 'not severe' impairment may . . . narrow the range of other work that the individual may still be able to do"); Cunningham v. Apfel, 222 F.3d 496, 501 (8th Cir. 2000) (holding that the ALJ must consider "the combined effect of all impairments without regard to whether any such impairment, if considered separately, would be of sufficient medical severity to be disabling").

The Court recognizes that it is generally for the ALJ to assess the record and determine the weight to be accorded medical opinions and credibility, and that a court should "disturb the ALJ's decision only if it falls outside the available 'zone of choice.'" See Hacker, 459 F.3d at 937 (citations omitted). But, the Court believes that reversal and

remand are required here.   Many years have elapsed since Plaintiff filed for SSI benefits, and at least some of Plaintiff's impairments appear to be evolving in nature.  In reconsidering Plaintiff's ability to engage in substantial gainful activity, the ALJ should carefully consider the time frame of the relevant evidence.

## CONCLUSION

The Commissioner's decision that Plaintiff was not disabled within the meaning of the Social Security Act is not supported by substantial evidence.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **REVERSED** and that the case is **REMANDED** for further consideration.

An appropriate Judgment shall accompany this Memorandum and Order.


_____
AUDREY G. FLEISSIG
UNITED STATES MAGISTRATE JUDGE

Dated on this 19th day of September, 2008